AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

3/5/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ TV _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

3/5/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ clee _____ DEPUTY

United States of America

v.

Yong Jiang,

Defendant

Case No.   2:24-mj-01241

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

### [18 U.S.C. §§ 1956(a)(2)(A), 2(a)]

On or about May 12, 2022, in Los Angeles County, within the Central District of California, and elsewhere, defendant JIANG knowingly transported, transmitted, and transferred, and knowingly aided, abetted, counseled, commanded, induced, and procured another person to transport, transmit, and transfer, approximately $99,975 in funds to a place in the United States, within the Central District of California, specifically, a bank account held with East West Bank in the name of ZHC Logistics, from or through a place outside the United States, specifically, a bank account held with HSBC Bank N.A. in Hong Kong, with the

//

//

AUSA:   James C. Hughes (#2579)

intent to promote the carrying on of specified unlawful activity, specifically, the use of counterfeit postage meter stamps in violation of Title 18, United States Code, Section 501.

This criminal complaint is based on these facts:

    *Please see attached affidavit.*

    ☒ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

_____
Mark White, Postal Inspector USPIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____3/5/2024_____

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA:___James C. Hughes (#2579)

**AFFIDAVIT**

I, Mark White, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.    I am a Postal Inspector with the United States Postal
Inspection Service ("USPIS") and have been so employed since
August 2017.  I am currently assigned to the Revenue
Investigation Fraud Team located in Long Beach, California,
which is responsible for investigating fraud against the United
States Postal Service ("USPS" or "Postal Service").  Prior to my
current assignment, I was assigned to the Long Beach mail theft
team.

2.    During my employment as a Postal Inspector ("PI"), I
have participated in investigations related to financial and
postal-related crimes such as bank fraud, robbery, mail theft,
money laundering, counterfeit postage and postal-money-order and
revenue fraud.  My investigations of these crimes have included
bank and telephone records analysis, electronic and physical
surveillance, search warrants, arrests, reviewing evidence from
digital devices, and witness and suspect interviews.  I am
familiar with the rules and regulations governing the USPS,
including those pertaining to the acceptance, classification,
sorting and delivery of mail.  As a result, I have training and
experience regarding the methods used to commit fraud against
the USPS; the documents and other records that frequently
evidence such fraud; and detection and interdiction by the USPS
of counterfeit postage in the mails.  I have participated in or

conducted recent criminal investigations concerning schemes to defraud the USPS of the lawful payment of postage.

3.    From 2011 to 2017, I was a Special Agent with the United States Secret Service ("Secret Service") in Santa Ana, California.  As a Secret Service Special Agent, my duties included investigating fraud and related activity in connection with the fraudulent use of access devices, bank fraud, wire fraud, counterfeit United States currency, and identity theft.

4.    During my tenure as a federal agent, I completed a ten-week Criminal Investigation Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, as well as a seventeen-week training program at the Secret Service James J. Rowley Training Center in Beltsville, Maryland.  At these institutions, my training included, among other things, techniques for investigating and combating counterfeiting, wire fraud, bank fraud, money laundering, and access-device fraud.

5.    I received my bachelor's degree from Florida State University and my master's degree from American Military University.

## II.    PURPOSE OF AFFIDAVIT

6.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, YONG JIANG ("JIANG"), for violation of 18 U.S.C. § 1956(a)(2)(A) (international promotional money laundering).  This affidavit is also made in support of search warrants to search the person of JIANG and his residence:

      a.   15641 High Knoll Road, Encino, California 91436 ("the SUBJECT PREMISES") as described more fully in Attachment A-1;

      b.   The person of YONG JIANG ("JIANG"), as described more fully in Attachment A-2.

    7.   The requested search warrants seek authorization to seize evidence, contraband, fruits, and instrumentalities of criminal violations of 18 U.S.C. § 1956(a)(2)(A) ("the SUBJECT OFFENSE"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

    8.   Section 1956(a)(2)(A) is violated by whoever transfers a monetary instrument to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity. Counterfeiting postage meter stamps, in violation of 18 U.S.C. § 501, constitutes specified unlawful activity.

    9.   The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations, and training and experience, as well as information obtained through my review of evidence, investigative reports, interviews, surveillance materials, and information provided by other experienced participating PIs, Special Agents, Officers, Analysts, and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the criminal complaint against JIANG and requested search warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless

specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

#### A. SUMMARY

10. The USPIS, in coordination with Internal Revenue Service: Criminal Investigation ("IRS CI"), is investigating JIANG for his participation in a counterfeit postage fraud scheme perpetrated within the Central District of California and elsewhere. On June 21, 2023, a grand jury indictment was filed in the Central District of California, Case No. CR 23-00392-JLS, charging defendants Chuanhua Hu ("Hu") and Lijuan Chen ("Chen") with violations of 18 U.S.C. §§ 371 (Conspiracy to Defraud the United States), 472 (Passing and Possessing Counterfeit Obligations of the United States), and 501 (Forging and Counterfeiting Postage Stamps) (the "Hu and Chen Indictment"). In summary, the Hu and Chen Indictment alleged that Hu and Chen had owned and operated a package shipping business in City of Industry, California, whose customers included e-commerce and logistics businesses in the United States and China. The indictment charged Hu and Chen with conspiracy to defraud the United States by using counterfeit postage to ship packages through the mails. Hu and Chen were also charged with substantive counts of passing and possessing counterfeit postage meter stamps with intent to defraud and counterfeiting a postage meter stamp. The indictment alleged that through the

conspiracy, Hu and Chen caused losses to the Postal Service of at least $150 million.

11.  As detailed below, evidence obtained over the course of this investigation has revealed the following: JIANG schemed with Hu and Chen to ship throughout the United States millions of packages from China using counterfeit postage.  JIANG is the owner and operator of a Chinese logistics business named Quickfish Intelligent Technology Limited ("Quickfish").  Between 2020 and 2023, JIANG, through Quickfish, used international wire transfers of funds from China to the United States to purchase millions of dollars of known counterfeit postage from Hu and Chen.  The counterfeit postage was then used to ship packages on behalf of JIANG's China-based customers to addresses in the United States.  JIANG, by these wire transfers, sought to support and aid Hu and Chen in promotion of their counterfeit postage fraud scheme.

12.  The SUBJECT PREMISES is a residence owned and used by JIANG during his visits to the United States.  There is probable cause to believe JIANG is currently residing at the SUBJECT PREMISES and in possession of documents, digital devices, and other items linking JIANG to participation in and promotion of Hu and Chen's counterfeit postage scheme.

**B.  <u>COUNTERFEIT POSTAGE</u>**

13.  The USPS offers many postal services, including the delivery of packages.  All mailable articles shipped within the United States must comply with established mailing standards and

bear appropriate valid postage.  The mailer is responsible for proper payment of postage and all mail must be fully prepaid at the time of the mailing.

14.  Prepaid postage can be shown in the form of affixed stamps, stamped stationary, precanceled stamps, and postage meter imprints.  Prepaid postage can also be in the form of postage that consumers are able to print themselves using devices and systems provided by vendors licensed by USPS to sell postage products over the internet ("PC Postage"), such as vendors Endicia, Stamps.com, EasyPost, and Pitney Bowes.  PC Postage includes printed information that evidences to the USPS that the postage affixed to the package shipped was fully paid.

15.  The scheme under investigation here involves counterfeit PC Postage shipping labels.  PC Postage shipping labels have several parts, each providing substantive information to the USPS regarding the package shipped.  Some of this information is in a format that can be read by the human eye ("human-readable format"), while other information is in the form of barcodes that can only be processed and deciphered by a computer ("machine-readable format").  The human-readable and machine-readable components of PC Postage labels contain some of the same categories of information (e.g., weight, tracking number, date of purchase).  A photograph of one of the counterfeit shipping labels identified in this investigation is provided below with the various components identified in red text:



16.   Based on my training and experience, and my conversations with various USPS employees, I have learned that the items identified in the image above provide the following information:

a.   Postage Information:  This section provides information, in human-readable format, regarding the type of postage product (e.g., First-Class Mail), the date the postage

was purchased, the zip code from which the item is to be mailed, and the weight of the package.

b.   Intelligent Barcode:  This is a scannable barcode that provides information such as amount of postage, origin zip code, destination, mail class, weight, confirmation/tracking numbers, and a cryptographic signature;

c.   Meter Number:  This number identifies the specific postage meter used to print the postage.  A postage meter is a device or system of components a customer may use to print evidence that postage required for mailing has been paid. Postage printing machines or systems are typically leased by authorized providers for use in a customer's home or office.

d.   Shipper/Recipient Information:  This section provides information regarding both the party shipping the mail item, and the address and party to which the mail item is scheduled to be delivered.

e.   Tracking Barcode/Number:  A sixty-five bar barcode used by the USPS to sort and track letters and packages. The human-readable numeric sequence below the barcode identifies, among other things, the specific postage service provider, e.g., Endicia, Stamps.com.

17.  When attempting to determine whether an item of PC Postage is counterfeit, USPIS and USPS personnel will typically look to see if any of the unique identifiers on the postage are either invalid or inconsistent with other information on the shipping label.  For example:

a.     **Invalid Meter Numbers** – Counterfeit postage frequently contains incorrect or discontinued meter numbers. The postage label shown in paragraph 15 above shows a postage paid date of May 18, 2023.  It was identified as counterfeit based on the false meter number listed in the upper right corner of the label that begins with "07."  Based on my training and experience and conversations with various USPS Revenue Fraud Analysts ("RFAs"), I know that postage meters with numbers beginning with "07" were phased out of use in 2020. Accordingly, no valid postage printed in 2023 should bear the meter number listed on the shipping label shown above;

b.     **Invalid Tracking Numbers –** Counterfeit postage may also contain tracking numbers that are inconsistent with other information on the subject label.  During the course of this investigation, the USPIS identified multiple counterfeit postage labels produced by Hu and Chen bearing tracking numbers associated with third-party shipping services providers different from the entities listed on the counterfeit postage labels;

c.     **Obscured or Damaged Barcode Data -** Based on my training and experience, and conversations with RFAs, I know that individuals engaged in the production of counterfeit postage may use intelligent barcodes from previously shipped packages when fabricating counterfeit postage, and may obscure and alter the intelligent barcode data in order to prevent USPS personnel from discovering that the payment indicia on the postage is either wholly fabricated or unrelated to the postage

item being shipped, _e.g.,_ postage duplicated from another
shipped item;

   d. **Inconsistent Weight Information –** Based on my
training and experience, and evidence obtained over the course
of this investigation, I know that individuals engaged in the
production of counterfeit postage may purchase postage using
weight, size, and shipping distance information that is
inconsistent with the applicable parcel being shipped.  Postage
counterfeiters may then alter the human readable information on
the shipping label to conform to the package's true
characteristics, in an effort to conceal that insufficient
postage had been paid for the package.  For example, during the
course of this investigation the USPIS identified multiple
parcels bearing postage that had been purchased using a
designated weight that was substantially lower than the true
weight of the package.  The human readable information on the
shipping labels attached to these parcels had been altered to
conform to the true weight of the packages.

 **C.** **INVESTIGATION BACKGROUND**

  18. In late 2018 and early 2019, USPIS was notified by
USPS that a high volume of packages believed to bear counterfeit
postage were being introduced into the mail stream in the Los
Angeles area.  USPS staff were able to identify the postage as
likely counterfeit because the barcode data on the postage
appeared to be intentionally damaged and obscured in order to
render it unreadable by USPS sorting equipment.

19.  The return address used on the majority of the mail
with counterfeit postage listed "Hugh Hu LC Logistic, 17355
Railroad St, City of Industry, CA 91748" as the sender.  The
real property located at that address is a commercial warehouse
(the "Railroad St. Warehouse").  Records obtained from
Stamps.com showed an active PC Postage account in the name of
"LC Logistic/Hu" at the Railroad St. Warehouse, with Hu listed
as the contact.

20.  Hu was interviewed by PIs at the Railroad St.
Warehouse on November 20, 2019, and again on November 21, 2019,
regarding Hu's use of counterfeit postage.  I have reviewed
memoranda of interview prepared for both interviews.  During
these interviews, Hu confirmed that he received packages from
China that he then consolidated and mailed at USPS facilities.
Hu also confirmed that USPS stopped accepting his mailings in
November, i.e., the same month he was interviewed.  Hu falsely
claimed most of the packages he received had postage labels
applied when he received them.

21.  On November 23, 2019 -- two days after his interview
by PIs concerning his use of counterfeit postage -- Hu departed
Los Angeles International Airport (LAX) for Beijing, China.
According to additional flight records checks and local
surveillance, Hu has not returned to the United States since
then.  Chen, who is Hu's wife, and their child remained living
in the United States.

22.  Throughout 2020, 2021, and 2022, USPIS continued to
investigate variations of the counterfeit postage scheme.  On

11

multiple occasions, USPIS Investigators observed large volumes of mail items bearing counterfeit PC Postage being delivered to the USPS Los Angeles Processing and Distribution Center ("LA P&DC"), a postal facility in Los Angeles used to receive, sort, and distribute mail items.  Visually, the postage often appeared to be valid.  USPS and USPIS personnel were generally able to determine that the PC Postage was counterfeit only by identifying inconsistencies between the barcode data and human-readable information on the mailed items.  They determined that the bogus PC Postage frequently duplicated barcode data from previously mailed items onto new shipping labels in order to fabricate counterfeit postage.

23.  Based on my training and experience and my conversations with USPS personnel, I know that USPS personnel at the LA P&DC would reject deliveries of mail items by customers if they became aware that the postage on them was counterfeit. When this occurred, USPS staff would either refuse to take custody of the suspect mail items or would contact the company that delivered the suspect mail items and instruct them to retrieve the delivery.  However, due to the high volume of packages being submitted through the LA P&DC every day and limited USPS staff, I believe only a small portion of the items bearing counterfeit postage were screened, ultimately identified, and rejected.

D. **IDENTIFICATION AND SEIZURE OF COUNTERFEIT POSTAGE**

24.  On April 26, 2023, at approximately 7:00 a.m., I conducted surveillance of a warehouse located at 16285 Gale Avenue in City of Industry, California 91745 (the "Gale Ave. Warehouse").  The Gale Ave. Warehouse had previously been identified by multiple witnesses as a facility used by Chen and Hu to process and ship packages believed to bear counterfeit postage.  Upon arrival, I observed a truck bearing CA plate 58595R3 parked against the wall.  Later in the day on April 26, 2023, at approximately 1:25 p.m., RFA Jonathan Truong observed the truck bearing the same CA plate 58595R3 pull into a loading dock at the LA P&DC and drop off 10 large double stacked carboard boxes and 2 single stack carboard boxes.  I have reviewed the contents of these boxes.  Based on a sampling of the packages in each box, I determined that each box contained multiple items of mail bearing counterfeit PC Postage.  The evidence of counterfeiting included invalid meter numbers and/or inconsistent human-readable and barcode data on the postage.

25.  On May 24, 2023, investigating agents executed a search warrant, issued by Magistrate Judge Patricia Donahue, at the Gale Ave. Warehouse for evidence of counterfeit PC Postage. Using postage scanning machinery, USPS staff were able to scan and review approximately 17,663 mail packages seized during the execution of the search warrant.  USPS staff determined that approximately 15,854 of the packages reviewed bore counterfeit PC Postage shipping labels, because the packages bore either discontinued meter numbers or tracking numbers that were

13

inconsistent with other information on the shipping labels. Many of the remaining packages bore PC Postage shipping labels that were determined to have been purchased postage from EasyPost, a legitimate third-party shipping services provider. After comparing the human readable information to the machine readable information on the affixed EasyPost postage, however, USPS staff determined that the vast majority of these shipping labels purchased from EasyPost used listed shipping weights that were substantially less than the amounts visibly shown on the shipping labels. As a result, the amount of prepaid EasyPost postage on the packages was insufficient for the weight of the packages shipped.

26. RFA Truong has reviewed counterfeit PC Postage items linked to Chen, Hu, and the Gale Ave. Warehouse through surveillance operations and search warrants executed by the USPIS. Based on his review of these mail items, RFA Truong identified the presence of multiple indicators of counterfeit PC Postage of the nature described above. He further reviewed USPS databases to identify all mail packages processed through LA P&DC bearing similar counterfeit indicators. Based on his analysis, RFA Truong estimates that, between August 2020 and May 2023, Chen and Hu and others working with them shipped over 35,000,000 packages containing counterfeit PC Postage, resulting in estimated revenue losses to the USPS of over $150,000,000.

E. **EVIDENCE PROVIDED BY CHEN REGARDING JIANG AND QUICKFISH**

27.  On May 24, 2023, contemporaneously with the execution of the Gale Ave. Warehouse search warrant, Chen was arrested pursuant to a complaint charging her with violations of 18 U.S.C. § 371 (Conspiracy) and 18 U.S.C. § 501 (Producing False Postage).  I conducted an interview of Chen following her arrest.  During the interview, Chen acknowledged that she managed the Gale Ave. Warehouse but claimed that she did not know that the postage labels being used in the warehouse were counterfeit.

28.  On June 21, 2023, Chen and Hu were charged by the Hugh and Chen Indictment.  Chen is currently in custody.  Hu remains in China.

29.  I participated in interviews of Chen in September and November 2023 conducted pursuant to a proffer agreement that provided Chen direct use immunity for her statements.  Chen, through her counsel, is currently engaged in ongoing plea negotiations with the government.  During the interview, Chen provided in substance the following information regarding JIANG and others in an effort to reach a more favorable disposition of her criminal case:

a.  Chen and Hu operated a shipping business out of the Gale Ave. Warehouse and knowingly used counterfeit PC Postage shipping labels on the vast majority of the packages they shipped.  The counterfeit PC postage shipping labels were created by Hu, and others operating at Hu's direction.  Hu marketed these counterfeit shipping labels to e-commerce and

15

logistics businesses in China.  After Hu left the United States in November 2019, Hu oversaw the counterfeiting operation from China, while Chen managed the day-to-day operations of the Gale Ave. Warehouse, which Hu and Chen used to receive, process, and distribute packages.

b.   Chen and Hu would sometimes ship multiple truckloads of packages per day from the Gale Ave. Warehouse. Chen and others working at her direction would fill large cardboard boxes - commonly referred to in the shipping industry as "gaylords" – with mail packages bearing a mix of counterfeit PC Postage and purchased EasyPost postage, and would transport the packages to USPS facilities for acceptance and shipping.

c.   In order to ensure that their packages would be accepted at USPS facilities and their counterfeit postage not detected, Chen and Hu employed a system whereby each gaylord of mail would contain a mixture of approximately 90% counterfeit PC Postage and approximately 10% purchased EasyPost postage.  The packages bearing purchased EasyPost postage would form the top layer of mail items in the gaylord.  This was done so if USPS staff happened to inspect the boxes of mail being delivered by Chen and Hu's employees, their attention would be on the top layer of EasyPost labeled packages, which was less likely to be detected as counterfeit.

d.   JIANG operated a large logistics business in China called "Quickfish" and had his own warehouse facilities in Los Angeles to receive and process packages from his customers in China.  JIANG was one of the major purchasers of counterfeit

16

PC Postage from Hu and Chen's business during the years 2020 through 2023.  During a portion of this period, JIANG would receive and stamp packages with counterfeit PC Postage provided by Hu and then deliver the packages to the Gale Ave. Warehouse. Hu and Chen would then have JIANG's packages transported to LA P&DC and other postal facilities for acceptance and shipping.

  e.   Chen estimated that Hu charged JIANG approximately $1.80-$2.00 per package for shipping services.  I know from my training and experience that this amount is substantially below the average cost charged by the USPS for first-class commercial postage for the typical size and weight of packages involved here.

  f.   Chen believed JIANG was aware that Chen and Hu used counterfeit postage to ship packages mailed from the Gale Ave. Warehouse because, among other things, JIANG had assisted Chen and Hu in their efforts to avoid detection of their counterfeit PC Postage by USPIS and USPS personnel.  Between May and June of 2020, when USPS personnel were frequently rejecting deliveries of mail packages bearing counterfeit PC Postage submitted by Chen and Hu and their workers for JIANG and others, JIANG instructed JIANG's subordinate, J.L., to assist Chen in transporting JIANG's packages from California to Ohio and Texas in an effort to get them accepted at USPS in other states they believed provided less scrutiny of counterfeit PC Postage.

  g.   Chen also had a telephone conversation with JIANG in 2022 in which she discussed the need to ensure that at least 10% of the packages in the Gale Ave. Warehouse delivered to

postal facilities had affixed purchased EasyPost postage, to reduce the risk of USPS detecting the counterfeit PC Postage.

30.   On February 9, 2024, Chen's defense attorneys conveyed to the government on behalf of Chen the following additional information Chen provided regarding her conversation with JIANG about using EasyPost postage:  Chen discovered that JIANG and his subordinates were mixing in their deliveries to the Gale Ave. Warehouse packages containing postage not purchased from Hu and Chen but from other suppliers.  Chen then confronted JIANG and explained to him that this needed to stop because JIANG's conduct was making it harder for Chen and Hu to ensure that at least 10% of the packages delivered to postal facilities included the purchased EasyPost postage, used to reduce risk of USPS detection of counterfeit PC Postage.

31.   Chen's defense attorneys provided the government documents they claim are screen shots of chat messages exchanged between Hu and JIANG, between 2019 and 2023, via the WeChat text messaging application.  Chen's attorneys advised that Hu provided these messages to them in order to assist them in their representation of Chen.  (Chen's attorneys advised that they do not represent Hu.)  These messages are written in Chinese.  I know that Hu used WeChat text messages to communicate with others regarding his shipping business, based on statements provided by former employees who worked at the Gale Ave. Warehouse, as well as WeChat text exchanges, obtained by the USPIS from the search of these employees' phones, in which an

identifier known to be associated with Hu is included in the list of participants.

32.   As part of my investigation, I have reviewed a WeChat message exchange between Hu and JIANG covering the period of December 2019 through April 2023.  These messages were initially translated using the Google translate application and were then reviewed with a Postal Inspector who is fluent in Chinese and capable of reading Chinese characters.  Based on my review of these translated messages, I learned the following:

   a.   Beginning as early as December 2019, Hu and JIANG refer repeatedly in their conversations to a "20% off account," including messages in which JIANG asks Hu whether Hu has "tested the 20% off account" and whether JIANG can use the "20% off account."  Chen has confirmed that the "20% off account" was Hu's codeword for the sale of counterfeit PC Postage.

   b.   Beginning as early as December 2019, Hu and JIANG discussed the need for discretion regarding the "20% of account."  In a message dated December 22, 2019, JIANG stated that the account must be "protected" and that "the fewer people who have to know, the better."

   c.   On February 18, 2023, JIANG sent Hu a link to an online article discussing efforts by the USPS to crack down on the use of counterfeit postage and told Hu that "[m]ore and more customers are reporting problems (not from our orders, but from other friends)."  JIANG also provided Hu with a screen shot of what appears to be a message from one of JIANG's customers

requesting a refund from JIANG based on the seizure of their packages by law enforcement.

       d.   On February 22, 2023, JIANG sent Hu a link to another article discussing USPS efforts to combat the use of counterfeit postage.  JIANG followed up by noting that the USPS would likely begin discarding packages in the future if the packages were determined to contain a "problematic order form." In response, Hu noted that this was "possible" and stated that "[p]reviously the post office still kept a message for you to pick it up, but it will be processed directly in the future." Hu then described how "[j]ust a few days ago, someone drove a truck to the post office.  He dropped off his items, was stopped, and then went to drop them off again, several times in a row."  Hu concluded by noting that "I was confident before, but if I think it won't work, I can still take it back" and "it won't work in the future."  Based on my training and experience and knowledge of the evidence obtained over the course of this investigation, I believe Hu and JIANG referred to a tactic employed by them in which their delivery drivers would repeatedly attempt to deliver packages at USPS facilities, even after being warned by USPS staff that the postage on the packages was counterfeit, in hopes that eventually the counterfeit postage packages would be accepted at the facilities.

**F. OTHER EVIDENCE LINKING JIANG TO QUICKFISH**

33.   Chen confirmed during her interview that wire transfers Chen and Hu received from Quickfish and JIANG were payment for counterfeit PC Postage and shipping services provided by Hu and Chen.

34.   IRS CI Special Agent Johnson Li ("SA Li") has identified ten domestic business bank accounts for which Hu, Hu's elderly father, and/or Chen are signatories (the "Hu/Chen Accounts") that received international wire transfers from a Hong Kong bank account held with HSBC Bank in the name of Quickfish, account number ending #2838 (the "Quickfish Account").  SA Li found, based on his review of bank account records for the Hu/Chen Accounts, that between January 2020 and May 2023, the Hu/Chen Accounts received at least 395 international wire transfers from the Hong Kong Quickfish Account, totaling over $34 million.

35.   SA Li also identified the following specific international wire transfer from the Quickfish Account to a Hu/Chen Account: On or about May 12, 2022, the sum of $99,975 was wire transferred from the Quickfish Account at HSB Bank in Hong Kong to a domestic account at East West Bank in the name of ZHC Logistics, account number ending #2931 (the "ZHC Account"), for which Chen is the sole signatory.  This wire transfer was made when, according to Chen, JIANG was one of the major purchasers of counterfeit PC Postage from Hu and Chen.

36.   From my review of bank records provided by HSBC Bank, I identified multiple incoming wire transfers from the Quickfish

Account that benefited JIANG.  I found a domestic Wells Fargo
Bank checking account held in the name of JIANG that received
multiple wire transfers from the Quickfish Account.  I also
identified three wire transfers, together totaling $450,000,
from the Quickfish Account to Fidelity National Title Company,
each with the notation "14725 W Cortez Lane, Credit to Escrow
No: 30082579-KR."  A public records search reveals that the real
property located at 14725 W. Cortez Lane in Panorama City,
California is titled in the name of JIANG and M.Z., who is
believed to be JIANG's spouse based on mortgage and financial
records obtained over the course of this investigation.

37.  JIANG has also been identified as the owner of
Quickfish by another witness.  On June 22, 2023, IRS CI Special
Agents conducted an interview of J.C. in Chinese.  I reviewed a
translation of the transcript of J.C.'s interview, in which J.C.
in substance provided the following information:

a.  J.C. previously co-owned a company that was an
intermediary with multiple clients in China looking for
assistance in getting their packages delivered in the United
States.  Quickfish was one of J.C.'s clients.  J.C. identified
JIANG as the owner of Quickfish.

b.  J.C.'s company previously contracted with Hu and
Chen to provide postage and shipping services.  This included
services for packages from Quickfish.  J.C.'s company stopped
doing business with Hu and Chen sometime in 2019, after the
company experienced severe delays in getting their packages
delivered via Hu and Chen.  After J.C. and his company ceased

doing business with Hu and Chen, JIANG and Quickfish began dealing directly with Hu and Chen.

38.  SA Li obtained from the government's Hong Kong Attaché a copy of Quickfish's Annual Return filed with the Hong Kong Companies Registry, dated June 22, 2023 ("2023 QuickFish Annual Return").  I reviewed the 2023 Quickfish Annual Return, which is in Chinese and English, and learned that JIANG is the sole director and shareholder of Quickfish.

39.  Given these wire transfers from the Quickfish Account for JIANG's benefit, including for JIANG's purchase of real property, the statements of Chen and J.C. confirming that JIAN owned and operated Quickfish, and JIANG's status as the sole director and shareholder of Quickfish as reported in the 2023 Quickfish Annual Return, it is reasonable to conclude that JIANG controls the international wire transfers from the Quickfish Account used to pay for counterfeit PC Postage created by Hu.

40.  On March 4, 2024, I reviewed an online search of the Hong Kong Companies Registry, maintained by the Chinese government, and confirmed that Quickfish is currently listed as an "Active" business.

G. **INFORMATION LINKING JIANG TO SUBJECT PREMISES**

41.  I reviewed a grant deed filed with the Los Angeles County Registrar-Recorder on March 27, 2023, which lists JIANG and M.Z. as the co-owners of the SUBJECT PREMISES.

42.  On October 12, 2023, SA Li conducted surveillance outside of the SUBJECT PREMISES.  At approximately 7:56 AM, SA

23

Li saw an individual matching JIANG's description leave the
SUBJECT PREMISES in a Blue BMW X5M50i with the California
license plate number 9HVV176 ("the Blue BMW").  A search of the
California DMV database reveals that the Blue BMW is registered
to M.Z.

43.  Entry records for JIANG show that he arrived at Los
Angeles International Airport on January 26, 2024, on a flight
from Hong Kong.  IRS CI Special Agent Zuhair Qazi conducted
surveillance outside the SUBJECT PREMISES the same day.  At
approximately 8:00 pm SA Qazi observed the Blue BMW enter the
driveway of the SUBJECT PREMISES.

44.  On February 23, 2024, while conducting surveillance
outside of the SUBJECT PREMISES, IRS-CI Special Agent Qazi
observed the Blue BMW exit the SUBJECT PREMISES.  The driver
matched the description of JIANG.

## H. TRAINING AND EXPERIENCE REGARDING FRAUD OFFENSES

45.  Based on my training and experience and information
obtained from other law enforcement officers who investigate
various fraud and money laundering offenses I know the
following:

a.   It is common practice for individuals involved in
financial frauds and money laundering to possess and use
multiple digital devices at once.  Such digital devices are
often used to facilitate, conduct, and track fraudulent
transactions and money transfers.  Individuals who participate
in financial fraud and money laundering schemes often have co-

conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.  Individuals involved in financial frauds and money laundering typically keep these digital devices in a location where they may be readily accessed, including on their person or in their residence.

b.   With respect to JIANG in particular, evidence provided by Chen's attorneys indicates that JIANG uses messaging applications, such as WeChat, to communicate with others regarding matters related to the counterfeit postage activity under investigation in this case, which constitutes the specified unlawful activity for the international promotional money laundering SUBJECT OFFENSE.  Accordingly, I believe JIANG is likely in possession of one or more digital devices containing evidence of the SUBJECT OFFENSE detailed above.

I.  **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

46.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the

cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    47.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

        a.    Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so

many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after

28

a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JIANG'S thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of JIANG'S face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## IV.   <u>CONCLUSION</u>

49.   For all of the reasons described above, there is probable cause to believe that JIANG violated 1956(a)(2)(A) (international promotional money laundering).  Further there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violation of the SUBJECT OFFENSE will be found in the SUBJECT PREMISES and on the person of JIANG, as described in attachments A-1 and A-2.


                                        /s/
                                   _____
                                   Mark White, Postal Inspector
                                   United States Postal
                                   Inspection Service


Subscribed to and sworn before me
this  <u>5th</u>  day of March, 2024.

_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE